UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DOUGLAS W. TUPAY,        Plaintiff, | : : : |
| v. | : 3:10-cv-00935 (JAM) : |
| MAXIM HEALTHCARE SVCS INC,        Defendant. | : : |

**RULING GRANTING SUMMARY JUDGMENT**

Plaintiff Paula Tupay was a home care nurse formerly employed by defendant Maxim Healthcare Services, Inc.[1] She alleges that defendant terminated her employment on the basis of a discriminatory and wrongful conclusion that she could not perform cardiopulmonary resuscitation (CPR). Her legal claims are several. First, she claims disability discrimination on the ground that her employer's belief that she could not perform CPR was wrongfully based on the fact of her disability. Second, she claims a breach of contract under the terms of the company's employee handbook. Finally, she claims negligent infliction of emotional distress on the basis of her employer's allegedly humiliating treatment of her in connection with her failed effort to achieve an in-house CPR certification.

For reasons set forth below, I grant defendant's motion for summary judgment. I conclude that plaintiff is estopped from claiming disability discrimination, that plaintiff had no contractual rights under the company's employee handbook, and that plaintiff has no claim of emotional distress that is cognizable under Connecticut law.

---

[1] Since filing this lawsuit, Paula Tupay has passed away. Douglas Tupay, Paula Tupay's son and the executor of her estate, now serves as plaintiff, but for the sake of simplicity I will continue to refer to Paula Tupay as "plaintiff" in this opinion.

**BACKGROUND**

Plaintiff Paula Tupay was a trained nurse with 40 years of nursing experience who provided in-home care to children and infants with severe illnesses and disabilities. In 1993, she had double knee replacement surgery, and since the late 1990s, she used a cane to walk.

In the summer of 2007, plaintiff attended an interview for a pediatric nursing position with defendant Maxim Healthcare Services, a company for whom she had worked several years earlier. The open position was for a nurse who would coordinate and provide home care services. The physical requirements of the job involved "[p]rolonged or considerable walking or standing," ability "to lift, position or transfer patients" and "to lift supplies and equipment," as well as "[c]onsiderable reaching, stooping, bending, kneeling or crouching." Doc. #44-1 at 7. Plaintiff arrived at that interview using her cane and discussed her knee surgery with Alissa Gnolfo, Maxim's Director of Clinical Services. Gnolfo believed plaintiff to be qualified for the position and following that interview, in July 2007, defendant hired plaintiff as a registered nurse to provide private nursing services for defendant's patients.

Plaintiff cared for several patients who were between one and two years old. In March 2008, at the time of the events in question in this lawsuit, she primarily cared for one patient, a toddler who was over the age of one and who had severe disabilities, including respiratory problems. Her patient had a tracheotomy tube for breathing and was fed through a feeding tube. Plaintiff was the only nurse caring for this patient between the hours of 11 p.m. to 7 a.m., and she would have been required to lift the child under certain circumstances.

Defendant required all of its healthcare provider employees to maintain an updated CPR certification and to provide the company with current certification credentials annually. A few

months before plaintiff's CPR certification credentials were to expire, she signed up for an in-house certification course hosted in March 2008.

The in-house certification course required participants to watch a video provided by the American Heart Association, to take a written test, and to administer chest compressions on "dummy" mannequins. The course used the same dummy for the child and adult CPR tests and a different dummy for the infant test. To perform the compressions, all the other participants in the course knelt down on the floor next to the CPR dummy. They compressed the dummy's chest to a certain depth, at which point the dummy emitted a clicking sound to indicate that the compression was sufficient. Plaintiff, however, was unable to kneel on the floor because of her knee problems. She asked that the dummy instead be placed on a conference table in the room. Her request was accommodated because the American Heart Association requires only that the dummy be placed on a hard surface.

But even when the dummy was placed on a conference table, plaintiff was unable to achieve sufficient compression and to elicit the clicking noise. The course instructor, Robert Thrall, had never failed a student due to his or her physical inability to perform compressions, and he left the room to see if somebody else nearby could witness plaintiff's efforts. Soon thereafter, both Gnolfo and Ernestine Hull, defendant's Director of Human Resources, entered the training room and watched plaintiff make several more unsuccessful attempts to do compressions on the table. At that time, the other class attendees had finished the course and left the room. Plaintiff was visibly upset.

Thrall then invited plaintiff to try doing compressions on a lower surface, hypothesizing that the height of the conference table made it difficult for her to do deep enough compressions. All four individuals—Hull, Gnolfo, Thrall, and plaintiff—entered Gnolfo's office, and plaintiff

attempted to do the chest compressions with the dummy on Gnolfo's desk. Again, she could not do them. Nor could she do the chest compressions when the dummy was placed on a chair. Ultimately, plaintiff gave up, and Thrall suggested that she receive physical therapy and then return for another certification course. Although Thrall recertified plaintiff for infant CPR, he did not recertify her for adult CPR because of her failure to complete the chest compressions.

Gnolfo and defendant's account manager, David Brown, did not allow plaintiff to return to patient care before she had retaken the CPR test (and despite the fact that her prior certification for CPR would not expire for a few more months). Instead, they invited her to retake the in-house test at no added cost. Plaintiff declined. She opted instead to pay separately to retake the test independently the next week with a different provider, known as "A Second Chance."

On March 20, 2008, plaintiff presented a renewed CPR certification card from A Second Chance to Gnolfo and Brown. But Gnolfo and Brown declined to allow plaintiff to return to work because, under the circumstances, they did not trust the reliability of the outside provider's certification. After seeing plaintiff's inability to perform compressions and in view of plaintiff's refusal to demonstrate her ability to perform the required compressions, Gnolfo was not comfortable sending plaintiff to provide in-home care to patients.

About one month later on April 17, 2008, plaintiff received a letter advising her that defendant had terminated her employment because her "performance or lack thereof at the CPR training . . . showed that [she did] not have the basic competency" to care for her patients. Docs. #44 at 12, ¶ 66; #51 at 10, ¶ 66.

Subsequently, plaintiff applied to the federal Social Security Administration for disability benefits. On her application, which she affirmed under penalty of perjury, she indicated that she "became unable to work because of [her] disabling condition on March 13, 2008." Doc. #44-2 at

4

10. She also reported that her knee replacement and "patellar tendon rupture" limited her ability to work in that she was "unable to stand for . . . any period of time," could "not lift anything," and was "unable to pass CPR certification." *Id.* at 31. Based on that application, she was awarded and received $1,786 per month in disability benefits.

### DISCUSSION

Defendant has moved for summary judgment on each of plaintiff's claims. The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

### *Disability Discrimination*

Plaintiff first claims that defendant discriminated against her in violation of her rights under the Connecticut Fair Employment Practices Act (CFEPA) when it "terminated her

employment due to her knee-related disability" in spite of the fact that "she was able to perform all essential functions of her job with or without a reasonable accommodation." Doc. #1 at 8, ¶¶ 2, 4.[2] A CFEPA claim of disability discrimination is subject to the familiar *McDonnell Douglas* burden-shifting standard. *See Stoffan v. S. New England Tel. Co.*, 4 F. Supp. 3d 364, 372–73 & n.2 (D. Conn. 2014); *Curry v. Allan S. Goodman, Inc.*, 286 Conn. 390, 415, 426, 944 A.2d 925 (2008). Therefore, a plaintiff may establish a *prima facie* case for disparate treatment if she shows:

> (1) [s]he suffers from a disability or handicap, as defined by [CFEPA]; (2) [s]he was nevertheless able to perform the essential functions of [her] job, either with or without reasonable accommodation; and that (3) [the defendant] took an adverse employment action against [her] because of, in whole or in part, [her] protected disability.

*Curry*, 286 Conn. at 426 (quotation marks and citations omitted). If the employee succeeds in meeting that burden, then the employer may present a legitimate non-discriminatory reason for acting, and then the employee must ultimately prove that the proffered reason is pretext for a discriminatory motive that actually caused the adverse employment action. *Stoffan*, 4 F. Supp. 3d at 372.

Plaintiff's disability claim fails from the outset because she cannot establish that she was able to perform the essential functions of her job. Indeed, she is judicially estopped from doing so because of her contrary representations to the Social Security Administration. The doctrine of judicial estoppel is designed to prevent a party from playing "fast and loose" with the court system by taking inconsistent positions in successive proceedings in order to derive an unfair benefit or advantage. *See Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 485–86 (2d Cir. 2014); *In re Adelphia Recovery Trust*, 634 F.3d 678, 695–96 (2d Cir. 2011). Judicial

---

[2] Plaintiff also claims that defendant "discriminated against [her] in that it perceived her as being disabled and therefore unable to perform the essential functions of the job." Doc. #1 at 8, ¶ 3. There is no need to consider this claim because defendant has conceded that plaintiff had an "actual disability." Doc. #58 at 11.

6

estoppel not only applies when a party takes inconsistent positions in successive court proceedings but also "applies to sworn statements made to administrative agencies such as the Social Security Administration." *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010). To this end, "a plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will . . . negate an essential element of her [disability discrimination] case" unless she offers "a sufficient explanation" for the discrepancy. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999); *see also DeRosa*, 595 F.3d at 104 (judicial estoppel applies to successive positions that are in "irreconcilable direct conflict") (internal quotation marks and citation omitted).

Plaintiff completed a disability benefits application on January 5, 2009, claiming that she became "unable to work" on March 13, 2008—the day of the CPR certification course. Doc. #44-2 at 10. Her application states that she could not work because she was "unable to stand for . . . any period of time and" could "not lift anything." *Id.* at 31. These statements starkly contrast with plaintiff's nursing job requirements, which included "[p]rolonged or considerable . . . standing" and the ability "to lift . . . patients" as well as "supplies and equipment." Doc. #44-1 at 7. Plaintiff herself acknowledged in her disability application that her nursing job required her to stand for eight hours each day and to lift her patient every two hours. Doc. #44-2 at 32. Plaintiff has not offered an explanation for the contradiction between her lawsuit and her statements to the Social Security Administration.

Even if plaintiff's prior claimed inability to stand or lift were not dispositive of her present claim that she could perform the essential functions of her job, she is also estopped from claiming that she could pass the CPR certification. Plaintiff stated in her Social Security application that she was "unable to pass CPR certification due to knee surgery," Doc. #44-2 at

7

31, although she now claims that she could do the essential functions of her job. Plaintiff argues that no inconsistency exists because she could have "become recertified for CPR [ ] if she was given an accommodation during the testing." Doc. #50 at 15–16; *see Cleveland*, 526 U.S. at 803 (concluding that a plausible explanation for discrepancies in a disability application may be that an applicant may be able to work *with an accommodation*—a factor not considered by the Social Security Administration). But once the instructor granted plaintiff's request to move the dummy off the floor—the only area that she could not access because of her disability—her knee condition did not warrant any further accommodation. Any other difficulties that plaintiff had in performing CPR were caused by factors other than her claimed knee disability. *See Curry*, 286 Conn. at 408, 415–16 (applying federal definition of a reasonable accommodation as one "that could overcome" a disabled employee's "limitations *resulting from the disability*" to CFEPA claims (citing 29 C.F.R. § 1630.2(o)(3)) (emphasis added)). For these reasons, I conclude that plaintiff is now estopped from claiming that she could perform the essential functions of her job.

Even if plaintiff were not judicially estopped from making her case, however, there is another impediment to her claim. Here I distinguish between the CPR certification job requirement, addressed above, and another "essential function" of her job: "[i]nitiat[ing] appropriate preventive and rehabilitative nursing procedures," which, as clarified at oral argument, could include administering CPR in an emergency and under unpredictable circumstances. Doc. #44-1 at 7. There is no evidence that plaintiff would have been physically capable of administering CPR under emergency circumstances, on whatever surface might be available—a job requirement distinct from mere CPR certification.

In addition, I do not credit plaintiff's contention that, in spite of failing the adult CPR test on March 13, she could still do the "essential functions" of her job because she passed the infant

portion of the test and she "only worked with infants." Doc. #69. Plaintiff's patient at the time of her termination was a young girl over the age of one. At that age, a health practitioner would have to administer child (not infant) CPR, Doc. #58-1 at 3, and the parties agree that there is no evidence that plaintiff passed the child portion of the test. In fact, the child and adult tests are administered using the same CPR dummy—the dummy on which plaintiff could not do chest compressions. I see no evidence that plaintiff could have provided adequate care—let alone performed lifesaving CPR—for the one-year-old child that had been under her care.

In short and in light of her contrary representations to the Social Security Administration, no genuine issue of fact remains to suggest that plaintiff was able—even with an accommodation for her knee disability—to perform the essential and potentially lifesaving functions of her job. Accordingly, defendant's motion for summary judgment as to plaintiff's claim of disability discrimination will be granted.

### *Breach of Contract*

Plaintiff claims that defendant's termination of her employment was in breach of defendant's obligations under its own "Employee Handbook." *See* Doc. #44-3 at 6–36. First, plaintiff contends that, under the Employee Handbook, she should have been placed on inactive status—rather than terminated—until her CPR credentials could be updated. Second, plaintiff asserts that her termination was a breach of the Employee Handbook's policy against disability discrimination.

In Connecticut, "[t]he elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291, 87 A.3d 534 (2014). I am primarily concerned with the first element—the formation of an agreement—

because the Employee Handbook not only makes clear that plaintiff remained an at-will employee (Doc. #44-3 at 10, 23), but also that it does not give rise to an employment contract. "It is firmly established that 'statements in an employer's personnel manual may . . . under appropriate circumstances . . . give rise to an express or implied contract between employer and employee.'" *Gaudio v. Griffin Health Servs. Corp.*, 249 Conn. 523, 532, 733 A.2d 197 (1999) (citation omitted). But "'employers can protect themselves against employee contract claims based on statements made in personnel manuals' by . . . 'including appropriate disclaimers of the intention to contract . . . .'" *Id.* at 535 (citation omitted). Moreover, "whether a manual is an enforceable contract is . . . a question of law for the court," *Owen v. Georgia-Pac. Corp.*, 389 F. Supp. 2d 382, 391 (D. Conn. 2005) (citation omitted), and only "in the absence of definitive contract language" will this question proceed to trial. *Id.* (quoting *Carbone v. Atl. Richfield Co.*, 204 Conn. 460, 471–72, 528 A.2d 1137 (1987)).

On the first full page of defendant's 2008 Employee Handbook, following the table of contents, is a disclaimer stating in all-capital bold lettering:

> **THE POLICIES CONTAINED IN THIS HANDBOOK . . . . ARE NOT INTENDED TO ALTER THE AT-WILL STATUS OF THE EMPLOYMENT RELATIONSHIP IN ANY WAY. THE POLICIES CONTAINED IN THIS HANDBOOK DO NOT CONSTITUTE AN EXPRESS OR IMPLIED CONTRACT BETWEEN THE COMPANY AND ANY OF ITS EMPLOYEES OR A CONTRACT TO PROVIDE BENEFITS FOR ANY PERIOD OF TIME.**

Doc. #44-3 at 9. Once again, on the last page of the handbook, directly before the area where employees are expected to sign their name, another boldface all-capital disclaimer appears, stating: "**THIS HANDBOOK IS NOT AN EMPLOYMENT CONTRACT, NOR DOES THIS HANDBOOK GUARANTEE ANY FIXED TERMS OR CONDITIONS OF YOUR EMPLOYMENT.**" *Id.* at 36. These disclaimers are sufficiently clear and conspicuous to be

valid on their face, and plaintiff has cited no grounds to challenge their validity or applicability. *See Baron v. Port Auth. of New York & New Jersey*, 271 F.3d 81, 88 (2d Cir. 2001) (applying New York Law to find a disclaimer effective if it is "unambiguous" and is "conspicuously placed in the employee handbook such that the employee reasonably could be expected to read it"); *Wong v. Digitas, Inc.*, 2015 WL 59188, at *4–*5 (D. Conn. 2015) (clear, conspicuous, and explicit disclaimers precluded conclusion that employee handbook created an employment contract). Because no genuine issue exists to suggest that there was an enforceable employment contract, summary judgment is appropriate against plaintiff as to her contract claim.

### *Negligent Infliction of Emotional Distress*

Lastly, plaintiff claims negligent infliction of emotional distress arising from the humiliating events of her failed effort to pass the in-house CPR test in March 2008 and her termination about one month later. To prevail on a claim of negligent infliction of emotional distress, a "plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 446, 815 A.2d 119 (2003) (internal quotation marks and citation omitted). Moreover, "the fear or distress experienced by the plaintif[ ] [must] be reasonable in light of the conduct of the defendant[ ]." *Id.* at 447.

The Connecticut Supreme Court has sharply limited the availability of a claim of negligent infliction of emotional distress arising from the employment context. The court has recognized that employees "reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result" of "routine employment-related conduct, including performance evaluations, both formal and informal; decisions related to such

evaluations, such as those involving transfer, demotion, promotion and compensation; similar decisions based on the employer's business needs and desires, independent of the employee's performance; . . . disciplinary or investigatory action arising from actual or alleged employee misconduct, . . . workplace gossip, rivalry, personality conflicts," and other "conduct in the workplace." *Perodeau v. City of Hartford*, 259 Conn. 729, 757, 792 A.2d 752 (2002). With that in mind, Connecticut law is clear that "negligent infliction of emotional distress in the employment context arises only when it is based on unreasonable conduct of the defendant in the termination process," and an employer "may not be found liable for negligent infliction of emotional distress arising out of conduct occurring within a continuing employment context, as distinguished from conduct occurring in the termination of employment." *Id.* at 752, 762–63; *see also Grasso v. Connecticut Hospice, Inc.*, 138 Conn. App. 759, 771, 54 A.3d 221 (2012).

It is readily apparent that defendant was not negligent in the termination process with respect to the routine manner in which it informed plaintiff by letter sent to her home in April 2008 that it was terminating her employment. *See Yurevich v. Sikorsky Aircraft Div., United Techs. Corp.*, 51 F. Supp. 2d 144, 153 (D. Conn. 1999) (rejecting claim of negligent infliction of emotional distress arising from employer's notification of discharge "in a professional manner" by means of certified letter and without any "inconsiderate, humiliating or embarrassing" conduct).

Nor can any distress that defendant caused in March 2008 when plaintiff failed the in-house certification serve as grounds for a claim of negligent infliction of emotional distress. When plaintiff was relieved of duty, no decision had yet been made as to whether she could continue as an employee. In fact, Gnolfo encouraged plaintiff to return and retake the certification course offered by defendant. Plaintiff declined the invitation, and she did not later

return to demonstrate her ability to perform CPR. Docs. #44 at 9–10, ¶ 52; #51 at 10, ¶ 52. Even after Gnolfo received plaintiff's certification card from A Second Chance, defendant still had not decided how to respond. Gnolfo testified that she emailed her supervisor at that point asking "What now?" Doc. #44-4 at 29. Defendant's termination decision depended on whether plaintiff would later demonstrate to her supervisor that she could perform CPR—and she did not.

The conduct plaintiff complains of did not take place during the termination process. Other courts have rightly rejected shoehorn-style efforts to categorize pre-termination events as a part of the termination process itself. *See Julian v. Securitas Sec. Servs. USA, Inc.*, 2010 WL 1553778, at *12 (D. Conn. 2010) (employer's pre-termination investigatory conduct); *Dickinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 431 F. Supp. 2d 247, 260–61 (D. Conn. 2006) (manager's yelling at employee one month before discharge); *Rieger v. Orlor, Inc.*, 427 F. Supp. 2d 105, 123–24 (D. Conn. 2006) (employer's transfer of employee to another department one month before termination as purported pretext for termination); *Armstead v. Stop & Shop Cos., Inc.*, 2003 WL 1343245, at *6 (D. Conn. 2003) ("[M]ost of plaintiff's allegations do not describe conduct occurring during the termination process but rather describe defendant's underlying motivation (discriminatory discharge based on physical disability) or relate to pre-termination conduct (refusal to provide reasonable accommodations)."). Accordingly, summary judgment is appropriate because there is no genuine issue of fact to sustain plaintiff's claim of negligent infliction of emotional distress.

CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment (Doc. #42) is hereby GRANTED as to all counts. The Clerk is directed to close the case.

It is so ordered.

Dated at Bridgeport this 22nd day of January 2015.

/s/ _ Jeffrey Alker Meyer __
Jeffrey Alker Meyer
United States District Judge